[No. 3346.]

The Denver Jobbers' Association et al. v. The People.*

1. Information by the Attorney General—*Affidavits to Support.* An information by the attorney general praying an injunction against those engaged in an unlawful combination and conspiracy in restraint of competition in the necessaries of life, is suf-. ficiently verified by the affidavits of those cognizant of the facts therein alleged.

2. Monopolies—*Remedies to Restrain Unlawful Combinations— Pleadings—Sufficiency.* A complaint by the attorney general suing on behalf of the state to enjoin a combination to control prices of food products which alleges that wholesale and retail dealers combined to control prices, and to control the trade so that only members of the association constituting the combination could purchase food products for the retail trade, thereby denying to independent dealers freedom of trade in the purchase and sale of food products, and that the wholesale dealers conspired with the retail dealers' association that they would not sell food products to retailers until they would agree to sell the same to consumers at a price fixed by the combination, etc., sufficiently charges, as against a demurrer, an unlawful combination in restraint of trade.

3. Common Law—*Adoption—Statutes.* Under Rev. St. 1908, sec. 6295, providing that the common law of England and acts of Parliament in aid thereof, adopted prior to the fourth year of James I, excepting enumerated acts, shall be in force until repealed, the common law and acts of Parliament in aid thereof prior to the designated time, are a part of the law of the state, but acts of Parliament subsequently enacted repealing prohibitions in force at the designated time do not affect the common law in force in the state.

4. Courts—*Judicial Decisions—Construction.* The general expressions of an opinion of a court must be taken in connection with the facts of the case and expressions going beyond that are not controlling in a subsequent suit when the point is presented for decision.

5. Monopolies—*Illegal Combinations.* A combination between wholesale and retail dealers in food products to control prices and to prohibit a sale to retailers not members of the combination is void as contrary to public policy and is unlawful in the sense that the members are subject to criminal indictment and in the sense

*Syllabus by Scott, P. J.

that they may be restrained in equity at the suit of the attorney general on behalf of the state without the aid of any anti-trust statute.

6. —— *Offenses—Engrossing.* The offense of engrossing is a part of the common law adopted by Rev. St. 1908, sec. 6295, adopting the common law and acts of Parliament in aid thereof enacted prior to the fourth year of James I.

7. —— *Conspiracy in Restraint of Trade—Remedy.* A combination between wholesale and retail dealers to control the price of food products and to prevent the purchase of such products by retailers not belonging to the combination is a conspiracy at common law and is punishable under Mills' Ann. St., sec. 1294, punishing persons conspiring to co-operate in doing an unlawful act.

8. —— *Injunctive Relief.* Equity has jurisdiction at the suit of the attorney general on behalf of the people to restrain a combination of wholesale and retail dealers in food products formed to control the prices of such products and to prevent retailers not members of the combination from purchasing such products. ·

9. —— *Combination of Employes for Lawful Purposes—Statutes.* Rev. St. 1908, sec. 3924, permitting combinations of employes for lawful purposes, limits the combinations of employes to lawful purposes, some of which are specifically mentioned, and does not permit an unlawful combination in restraint of trade.

10. —— *Combination in Restraint of Trade—Statutes— Validity.* The right of freedom of trade, and the right to freedom from oppression by monopolies, is an inherent and constitutional right, and it is not within the power of the legislature to interfere therewith by granting the right to form a combination between wholesale and retail dealers to control the price of food products.

11. —— *Prosecution of Actions—Powers.* Under Const., art. 4, sec 1, providing that the executive department shall consist of a governor and attorney general who shall perform the duties prescribed by the constitution and law, and Rev. St. 1908, sec. 6186, requiring the attorney general to prosecute actions in which the state shall be a party or interested, when required to do so by the governor, the attorney general has jurisdiction, when ordered by the governor, to institute a suit on behalf of the people to enjoin a combination in restraint of trade. ·

12. —— *Prosecution of Action—Powers.* The attorney general is authorized under the common law to sue on behalf of the state to restrain illegal combinations.

13. COURTS—*Jurisdiction—Preservation of Prerogatives and Franchises.* Though the supreme court will assert its exclusive jurisdiction when necessary to preserve and protect the sovereignty and to maintain, unimpaired, the governmental authority of the state, the district court has jurisdiction of a suit by the attorney general on behalf of the state to enjoin illegal combinations of dealers in food products to control prices and to prevent retailers not members of the combination from purchasing such products, where the combination does not include all the wholesale or retail dealers of the state and does not affect all the people of the state.

*Appeal from Denver District Court.* HON. GEORGE W. ALLEN, Judge.

Messrs. BARTELS, BLOOD & BANCROFT, Messrs. ROTHGERBER, APPEL & LATON, Messrs. BICKSLER, BENNETT, DANA & BLOUNT, Mr. RALPH E. STEVENS, Mr. S. W. WIDNEY, Mr. GEO. Q. RICHMOND, for appellants.

HON. BENJAMIN GRIFFITH, Attorney General, Mr. ARCHIBALD A. LEE, Deputy Attorney General, Mr. WILLIAM H. DICKSON, for appellees.

Presiding Judge SCOTT delivered the opinion of the court.

This is an action by the attorney general of the state on behalf of the people to enjoin the defendants, corporations, officers, associations, partnerships and individuals, alleged to be engaged in a conspiracy in restraint of trade in the matter of food products.

The information alleges among other things, that the defendants are directly or indirectly engaged in the business of purchasing, shipping, selling, or otherwise dealing in food products—flour, sugar, coffee, breadstuffs and other articles of food in the state of Colorado, and that the business of

terested. That the articles and commodities in which the welfare of these defendants is solely concerned, but that said business is one in which all the people of the state of Colorado are vitally interested. That the articles and commodities in which they were and are dealing are not only of prime importance to the comfort and happiness of the people at large, but were and are necessary and essential to sustain life, and that every and all combinations between these defendants, among themselves or between these defendants or any of them, and other persons, by which they control and agree to advance, regulate or fix the price of said food products, and any and all contracts or agreements which by their operation have a tendency to increase the price thereof, affect injuriously the public good, and are unlawful as being in restraint of trade and as destroying competition, and thereby increasing the price of commodities of indispensable necessity to all the people of the state of Colorado.

That the ostensible objects of the defendants, corporations as set out in their articles of incorporations are legitimate yet in truth and in fact one of the principal, if not the principal object of said corporations is by combinations, contracts and agreements between themselves and the members thereof, and between themselves and other defendants herein mentioned, and others at this time to plaintiff unknown, to abolish competition, and to regulate and fix the price of the before mentioned commodities; that these defendant corporations prior to the first day of July, 1907, entered into a conspiracy and agreement among themselves and with the members thereof, and with the retail deal-

ers of said food products, with the intent and purpose to have said retail dealers abdicate their functions so far as the price of said commodities to the consumers was concerned, and that by reason of said contracts, conspiracies and agreements they have abdicated their functions, so that the price of said commodities to the consumer is regulated and fixed, not by the retailers themselves, but by these corporations, secretaries, members and standing committees thereof, and by said Denver Local No. 1, and that they and all of them have contracted, conspired, and agreed, between themselves, their members and officers and with others to refuse to sell said necessaries of life to any retail dealers except those who will agree to abide by the price so fixed; that said contracts, combinations and agreements destroy competition, enhance the price of food products, are in restraint of trade, and are unlawful and void.

Further, that the said corporations and the other defendants herein named, by unlawfully conspiring, as aforesaid, have controlled and still control practically all the supply of food products available for the sustenance of the people of Colorado, and have controlled and fixed, and still control and fix, and will continue, unless a court of equity interferes, to control and fix the price of said commodities to the consumers, the people of Colorado, at a figure largely in excess of the prices which would prevail could the public purchase in a fair, open and competitive market. It is further alleged that in accordance with the by-laws of the defendant, herein, The Denver Retail Grocers Association, each member, on joining said association, is required

to pay into the treasury of said association the sum of ten dollars ($10.) and one dollar ($1.) per month thereafter.

That by an amendment to said by-laws, ten per cent of all money received shall be set aside as a reserve fund to be used only for defense of the association against litigation, and for the erection of a permanent home for the association.

That, according to the provisions of said by-laws, each member upon being accepted as such is required to take the following

### "OBLIGATION.

I, ..........................., in the presence of the members of Denver Retail Grocers Association, do, by my own free will and accord, promise not to divulge any of the by-laws or rules of said association.    *    *    *    I further promise that I will not discuss the business or transactions of this association with any person whomsoever, not a member.    *    *    *    That I will abide by and support any and all actions taken by a majority vote of the members present at any meeting upon any measure for the interest of its members.

I make this promise upon my sacred honor, so help me God."

Further, that the defendants herein, to-wit: The Denver Jobbers Association and The Retail Merchants Association of Colorado, have similar provisions in their by-laws, or silent and secret agreements between themselves of the same import, and that, by reason thereof, they, the said corporations, have been able to accumulate, and have accumulated a large reserve fund, and that by means thereof they are able to boycott and intimidate a

minority of their own members, and a large number of independent dealers, and render it impossible for them to buy the necessities of life in a competitive market, or at all, in Colorado, without agreeing and binding themselves to abide by and sell at the prices so unlawfully fixed as aforesaid by said defendant corporations and others. And that by reason of the obligation herein set out and similar obligations or secret understandings which the members of The Denver Jobbers Association and The Retail Merchants Association of Colorado have been required to take, the said defendant corporations have shut the mouths of their members, and made it impossible for the attorney general to ascertain, excepting in rare cases from retired members, or to state specifically just what actions have been taken by a majority vote of the members present at any meeting of said association, or what contracts and agreements have been made in pursuance thereof. That at divers and sundry meetings of said association and each of them, measures have been adopted by a majority of the members present which have resulted in contracts, conspiracies, and agreements, having the effect to enhance prices of the necessities of life, to destroy competition, and to render it impossible for retail dealers in food products to buy goods with which to supply their customers, except on the condition that they sell the same at the prices fixed by said unlawful combination and conspiracy between these associations and the other defendants mentioned herein.

And that said defendant, Denver Local No. 1, has a large membership, and a great majority of the retail dealers of the city and county of Denver

dealing in the commodities and necessaries of life, herein mentioned, are members of said voluntary organization, and that said members have unlawfully conspired and contracted and agreed between one another, and with the parent organization, the defendant herein, The Retail Merchants Association of Colorado, and with the other defendants herein named, and with others unknown to this plaintiff, not to sell said necessities of life—flour, coffee, sugar, bread-stuffs, etc., to the consumers thereof except at a price fixed and agreed upon between the said, The Retail Merchants Association of Colorado, The Denver Jobbers Association, The Retail Grocers Association and the other defendants, the wholesale dealers in said commodities mentioned herein. And the plaintiff alleges further, that by reason of said unlawful conspiracies, contracts and agreements and secret understandings, that said retail dealers in the City and County of Denver have not been able since and long prior to the first day of July, A. D. 1907, and that they are not able now, and that they will not be able in the future, unless a court of equity intervenes, to buy within the state of Colorado the commodities herein mentioned unless and until they agree and bind themselves to sell the same to their customers, the consumers, at a price determined and agreed upon and fixed in conformity with the contracts and agreements so unlawfully entered into as aforesaid.

That beside the defendant, Denver Local No. 1, there are in the state of Colorado sixty-six other voluntary organizations, branches of the said defendant corporation, The Retail Merchants Association of Colorado, numbered from two to sixty-seven,

inclusive and called.................:..... Local
No.................. Said first blank being filled
by the name of the town where said local is situ-
ated and the second blank being the number there-
of, from two to sixty-seven, inclusive; that there is
one of said branches or locals in every important
city or town in every county in the state; that a
great majority of the retail dealers residing in said
cities and towns and dealing in the before described
necessaries of life, are members of the local estab-
lished in their town; that they are all under the con-
trol and management and direction of the parent
association, the defendant, The Retail Merchants As-
sociation of Colorado, and that they, and each of
them and the members thereof have unlawfully con-
spired, contracted and agreed between one another
and with the parent organization, the defendant
herein, The Retail Merchants Association of Colo-
rado, and with the other defendants herein named,
and with others unknown to this plaintiff, not to
sell the necessities of life—flour, coffee, sugar,
bread-stuffs, etc., to the consumers thereof, except
at a price fixed and agreed upon between the said,
The Retail Merchants Association of Colorado, The
Denver Jobbers Association, The Retail Grocers
Association, and the other defendants, the whole-
sale dealers in said commodities mentioned herein;
and further, that by reason of said unlawful con-
spiracies, contracts, agreements and secret under-
standings, that said retail dealers in each and all
of said towns throughout the state have not been
able since the first day of January, A. D. 1907, and
that they are not now able, and will not be able
in the future, unless a court of equity intervenes,

to buy within the state of Colorado the commodities herein mentioned, unless, and until, they agree and bind themselves to sell the same to their customers, the consumers in said towns, at a price determined and agreed upon and fixed in conformity with the contracts and agreements so unlawfully entered into as aforesaid.

The plaintiff further alleges that the following named defendant corporations, J. S. Brown & Bro. Mercantile Company, Nave McCord Mercantile Company, Struby-Estabrook Mercantile Company, C. K. Hurd Brokerage Company, The Merchants Biscuit Company, The Northern Colorado Wholesale Grocery Company, and the defendant, Jacob Savageau & Company, are, and at all times mentioned herein were jobbers and wholesale dealers and brokers in the commodities and necessaries of life herein mentioned, or some of them.

And, that the said jobbers, wholesale dealers and brokers, prior to January first, 1907, entered into divers and sundry unlawful conspiracies, combinations and agreements, and still maintain the same among themselves, and with the other defendants herein named, and especially with the defendant corporation, The Retail Merchants Association of Colorado, in and by which they fixed and maintained, and still fix and maintain, the prices upon sugar, flour, coffee and the other bread-stuffs and food products at which the retail dealers throughout the state should sell the same to their customers, and that they have conspired, contracted and agreed among themselves and with the other defendants herein, and especially with the defendant corporation, The Retail Merchants Association of Colo-

rado, that they would not sell said products, necessaries of life, to any retail dealers in the state of Colorado, unless, and until, they, the said retail dealers would first agree and bind themselves to sell said commodities to their customers, the consumers throughout the state, at the price so unlawfully fixed; that they still maintain said unlawful contracts and agreements, and that unless a court of equity intervenes, they will continue to carry out said contracts and agreements by fixing the price of said commodities and by refusing to sell to the said retail dealers until they comply with their unreasonable and unlawful demands. That such conspiracies, contracts and agreements destroy competition, enhance the prices of the necessities of life to the consumers throughout the state, are in restraint of trade, unlawful and void.

Further, that the defendants herein, members of the standing committees of the defendant corporation, The Retail Merchants Association of Colorado, O. B. Kinkle, W. G. Cain, T. H. Douglas, W. H. Howell, A. T. Sweet, J. N. McClellan, J. A. Beckwith, G. E. Simonton, H. A. Galbraith, and the defendants, J. R. Gardiner, secretary of the Retail Merchants Association of Colorado, the defendant, F. D. Thompson, president of said association, the defendant, S. W. Babcock, secretary of The Denver Retail Grocers Association, the defendant, H. A. Galbraith, president, and the defendant, G. A. Simonton, secretary and business manager of said defendant, The Retail Merchants Association of Colorado, are, and at all times herein mentioned were the agents and instrumentalities by and through

which the said unlawful conspiracies, combinations and agreements were and are executed.

And, that the manner of procedure adopted by said defendants is substantially as follows: The said corporation, The Retail Merchants Association, of Colorado, through its committees and agents, issued in pursuance of said unlawful combinations, conspiracies and agreements between themselves and the other defendants herein, and especially with said wholesale dealers, jobbers and brokers, and the retail dealers throughout the state, a notice or card by which they, the retail dealers, are instructed to maintain the price of said commodities at a certain figure; that the following is a sample of said notice or card:

THE RETAIL MERCHANTS ASSOCIATION OF COLORADO,

HEADQUARTERS STATE SUGAR COMMITTEE.

Dear Sir:

On and after, at once, you are kindly requested to maintain the following prices on sugar until further notice:

Granulated sugar, 16 pounds for........$1.00

And not more than the same proportion in smaller quantities.

Granulated sugar, family trade, 100 lb. sacks beet sugar ...........................·.....$6.00

Hotels and restaurants, 100 lb. sacks, cane 6.25

Very truly yours,

STATE SUGAR COM.

Denver, Colo.....:........

308-310-312 Mercantile Bldg.

Further, that the defendant, the said, The Retail Merchants Association of Colorado, through its

said committees and agents above mentioned, and through others, to this plaintiff unknown, have kept an oversight on the business of the retail dealers in said commodities throughout the state, and when any of them dared to sell any commodity to their customers at a price less than the price fixed in said card or notice, the said defendants, the wholesale jobbers, brokers and dealers mentioned herein, and others engaged in said wholesale business, and unknown to this plaintiff, were immediately notified thereof, and when next said retail dealer sent in an order for any of the necessities of life, for the supply of his customers, his order was refused and he received from the wholesaler the communication of the purport of the letter herein set out as a sample:

Denver, Colo.............

Gentlemen:

Replying to yours of the 27th, regret to advise you that we will be unable to fill your order of the 25th inst., given our Mr. Stout.

When difference now existing between your company and the Merchants Association is adjusted, we will be very glad to resume business with you.

Trusting same may be amicably adjusted in the near future, we beg to remain

Yours very truly,

THE MERCHANTS BISCUIT CO.,
C. A. BOWMAN, Mgr.

It is further alleged that by reason of the various acts, combinations, conspiracies and agreements set forth herein, that the prices of food products to all the people of the state of Colorado has been

greatly enhanced and have been raised and maintained at an unreasonable figure.

That the inevitable tendency of such conspiracies, combinations, contracts and agreements is to advance the price of the necessities of life to the consumers and the people of the state of Colorado; that each and every family, in the state, by reason of said conspiracies, contracts and agreements, have been compelled to pay, and will be compelled to pay in the future, unless a court of equity intervenes, twenty per cent more for the food which they consume than they would pay in a fair, open, unrestricted and competitive market.

And that the acts, combinations, conspiracies and agreements set forth herein were and are destructive to competition, in restraint of trade, are contrary to and in violation of the common law and of the laws of the state of Colorado, against public policy, unlawful and void, and a great, severe and irreparable injury and damage to the state of Colorado and to the people thereof; that the defendants threaten to and will continue to carry out said unlawful combinations, conspiracies, acts and doings herein set forth unless enjoined and restrained therefrom by this honorable court.

Further, that plaintiffs have no adequate or speedy remedy at law, and without the intervention of this honorable court, all the people of the state of Colorado will be compelled to pay unreasonable, excessive and unlawful prices for the necessaries of life, and the plaintiff will suffer irremediable and irreparable damage and injury from the said wrongful acts of the defendants.

Injunction is prayed in accord with the information.

The defendants filed separate demurrers to the information upon the following grounds:

1.   That the complaint and information does not state facts sufficient to constitute a cause of action against the defendants.

2.   That it appears upon the face of the complaint that the people of the state of Colorado have no right or authority to commence, maintain or prosecute this action.

3.   That it appears upon the face of the complaint that the people of the state of Colorado have no right to commence, maintain or prosecute this action upon the relation of the attorney general of the state.

4.   That it appears upon the face of the complaint that the attorney general of the state of Colorado has no right or authority to maintain or prosecute this action on behalf of the people of the state of Colorado.

5.   That the district court has no jurisdiction of the subject of this action.

6.   That the complaint is ambiguous, unintelligible and uncertain in this, that while it contains several alleged causes of action, yet they are not separately stated, as required by the rules of this court.

7.   That it appears upon the face of the complaint that several causes of action have been improperly united.

The defendants Jacob Savageau and Company, moved the court to dismiss the action upon the ground:

That the attorney general of the state of Colorado, had, and has no authority or power to institute or prosecute the said action in the name of, or on behalf of the people of the state of Colorado.

These demurrers and this motion were overruled and denied by the court, who thereupon granted a temporary injunction as prayed for in the information. Afterward the defendants elected to stand upon the pleadings, and the court then entered an order making the temporary injunction permanent, and rendered judgment for the plaintiffs, for costs of the action.

The information was supported by affidavits.

There are two questions presented for determination:

1. By the demurrers, in that the complaint is not sufficient to justify injunctive relief in a court of equity, even admitting that the act and agreements of defendants constitute a conspiracy in restraint of trade; and that the district court is without jurisdiction.

2. By the motion to dismiss, upon the ground that the attorney general had, and has, no authority or power to institute or prosecute the action in the name, or on behalf of the people of the state.

It is urged on argument and in one of the briefs of the appellants, that the complaint is insufficient, in that it is made upon information and belief.

The complaint was not challenged upon this point in the court below, nor in the assignment of errors and is therefore not entitled to consideration in this court. But if it were, it clearly comes within the rule of law permitting information of this character, if supported by the affidavits of per-

sons cognizant of the facts.   This information is supported by the affidavits of persons having personal knowledge of the facts charged in the information, even to the extent of having been members of at least one of the different associations, and victims of the alleged conspiracy.

"An information of the attorney general, ex officio, is equivalent to a bill in chancery verified on information and belief, and, like such a bill, in proper cases, calls for an answer under oath; but a temporary injunction will not usually go upon such an information, or such a bill, unsupported by positive affidavit, until the defendant has had an opportunity to contradict it on oath and has failed to do so." *Atty. Gen. v. Railroad Cos.*, 35 Wis. 426.

It is urged also that the demurrer does not admit legal conclusions but only the facts pleaded. This rule is admitted but the facts so clearly charge a conspiracy in restraint of trade as not to require argument upon that point.   Indeed the allegations of the complaint seem to charge such a combination in that particular as to be astounding in its announcement, merciless in its execution, and fearful in its possibilities.

It is substantially admitted by counsel that the combination and conspiracy charged, are unlawful in the sense of being void, but it is denied that there is any remedy in equity.   The contention of the defendants is best stated in the language of counsel as follows:

"The purpose of the action brought by the attorney general is to enjoin the further execution of

the combinations and contracts which are alleged to be in restraint of trade, and the execution of which stifles competition, and enhances the prices of certain commodities to the consumers. The complaint alleges no specific injury to any particular person or to his business, nor an intent to unlawfully injure any one, or his business. Our contention is that contracts in general restraint of trade are simply void, and, for that reason, unenforceable; and that a court of equity will neither enjoin their enforcement nor aid in their fulfillment."

Thus, whatsoever may be the injury to the individual, however great the injustice and danger to the public, the law is such that courts of equity must sit with hands folded while all our citizens constituting the public, are plundered of the very rights set forth in the Declaration of Independence and guaranteed by the Constitution.

Admittedly there is no statute of this state covering the question here, except as it may refer to the powers of the attorney general. Therefore, if the complaint be sustained it must be upon common law authority, and as enacted by the statutes of this state in relation thereto.

It is provided by section 6295 Revised Statutes of 1908:

"The common law of England, so far as the same is applicable and of general nature, and all acts and statutes of the British Parliament made in aid of, or to supply the defects of the common law, prior to the fourth year of James the First, (excepting the 2nd section of the 6th chapter of 43d Elizabeth, the 8th chapter of 13th Elizabeth and the 9th chapter of 37th Henry 8th) and which are

of a general nature, and not local to that kingdom shall be the rule of decision, and shall be considered as of full force until repealed by legislative authority.''

This is a case where the common law is applicable, and is general in its nature. The question involved is one of general and public import and not local to the Kingdom of Great Britain. The excepted acts of the English Parliament cited in the statute, refer to matters not involved in this action.

Therefore, the common law and all acts and statutes of the British Parliament made in aid of, or to supply the defects of the common law, prior to the first year of James the First, which was the year 1607, is a part of the law of this commonwealth, in full force and effect, and must be the rule of the decision in this case.

It will be seen that the complaint charges that the defendants, by means of such conspiracy, have controlled and still control a large part of the supply of food products available for the sustenance of the people of Colorado, and have controlled and fixed, and still control and fix, and will continue, unless a court of equity interferes, to control and fix the price of said commodities, to the consumers of the state, at a figure largely in excess of the prices which would prevail could the public purchase in a fair, open and competitive market.

That each member of defendant, The Denver Retail Grocers' Association, is required to pay into its treasury the initial sum of ten dollars, and one dollar per month thereafter, toward a fund for the expense of maintenance and legal defense for the

protection of the association in its unlawful and, if the complaint be true, its outrageous conduct.

It also appears from the information that this association is an oath bound secret concern in which oath, the members bind themselves not to discuss the transactions of the association with others than members, to relinquish all right of individual will, and to be bound by and support the will and action of the majority. Also that the defendants, The Denver Jobbers Association and The Retail Merchants Association of Colorado, are likewise secret oath bound associations, wherein the members surrender freedom of trade and independence of action, to the will of the majority. It will be seen also that the latter association has what is termed sixty-seven locals, included in every important city or town in the state, one in each city or town, and that a majority of dealers in each town are members of the local, and that all such are under the control and management of the said Retail Merchants Association. That all the members of such locals have so conspired, and under oath, secretly agreed, not to sell food products to the consumers, except at a price fixed by the said Retail Merchants Association of Colorado, The Denver Jobbers Association and The Retail Grocers Association of Denver.

It will further appear from this complaint that by reason of such conspiracy, agreements and conduct of the defendants, retail dealers throughout the state are wholly unable to purchase for their trade any of such necessities of life unless, and until they agree and bind themselves to sell to their customers at prices fixed and determined, by the

defendant conspirators; and thus independent deal-ers are denied the freedom of trade both in purchase and sale, and this is enforced by means of coercion in the use of the indefensible boycott. For it is charged that the defendant wholesale dealers have conspired and agreed with the defendants, The Retail Merchants Association, that they will not sell any food products to any retail dealers in the state, until they shall agree to sell the same to consumers at the prices fixed by the conspirators. So that, if this complaint be true, the independent dealer is driven beyond the confines of the state to purchase his merchandise, or forced to quit business within the state. Sample statements fixing prices at which products shall be sold and sample letters of the jobbers refusing to sell goods until the independent dealer has made his peace with the combination, are set out in the information, and in the affidavits in support of it.

It requires no elaboration to show this to be a condition affecting almost every man, woman and child in the state; a condition so shocking as to be almost unbelievable; a menace to the prosperity, property and liberty of the whole people.

It thus appears from the complaint that the retail grocers of this state, whether members of the so-called Retail Merchants Association of Colorado or not, are to be made nothing short of commercial slaves to the combine of that association, with the Jobbers Association. They must surrender their individual judgment, their right to independent action, their will, and their freedom of trade, to that combine. They must buy where it dictates and are compelled to sell at the prices it fixes. Their state

is more humiliating, if not more helpless, than that
of the consumers who are the victims and the prey
of the combination.

It is to be regretted if the retail dealers are in
this conspiracy of their own volition. For this class
of tradesman are usually men of moderate means,
and with their families are consumers of other ar-
ticles of necessity, aside from those in which they
deal. They must realize that this is an age of mo-
nopoly, monopoly in life's every necessity; in met-
als, from the pin to steel rails; in clothing from
the baby's gown to the shroud of the aged; in build-
ing, from the door latch to the completed struc-
ture. It affects alike the individual consumer and
producer. From these the tradesman must receive
his profits. It is this almost universal class of pro-
ducers and consumers, that are being thus driven
to extremity. Are not these general conspiracies
and combinations fast killing the goose that lays
the golden egg, for tradesmen. May not this mo-
nopoly in everything, be likened unto a sort of devil-
fish combine, whose repulsive form may be at every
fireside and whose blood sucking tentacles are in-
tended to be at the throat of every man who earns
his bread in the sweat of his face. Surely the con-
spiracy, combination and conduct charged is unlaw-
ful or the great law-givers and law-writers, have
misconceived the law, from Moses to Blackstone.
Certainly these acts are criminal or we have been
woefully mistaught as to the constituent elements
of crime. And logically they may be punished on
the one hand and prevented on the other, or we must
confess in sorrow that our government has failed
in its guaranty of individual liberty.

The principal case relied on by the defendants in support of their contention is that of the *Mogul Steamship Co. v. McGregor,* 23 Queen's Bench Div. 598. This case has been the chief reliance of the defense in many cases of similar character, but has so frequently been distinguished and disapproved by the later decisions in this country as to make it at best, of questionable authority. That was an action for civil damages upon the part of certain steamship owners, against others, banded together by an agreement called a conference, and having for its purpose the control of the shipping trade in the article of tea from certain ports in China to England. Again, it was a decision by a divided court, consisting of three judges. Lord Esher, Master of the Rolls, in a strong dissenting opinion held that the plaintiff should recover, and also that the agreement and the acts in consequence of it, constituted an indictable offence. Further, Lord Fry in his opinion admits that under the common law prior to the enactment of certain repealing statutes during the reign of George III., the action would have been held injurious to the public good, and criminal accordingly, and bases his decision chiefly upon such acts of parliament and upon the later acts of 7 and 8 Victoria 24, for he says:

"The ancient common law of this country and the statutes with reference to the acts known as badgering, forestalling, regrating, and engrossing, indicated the mind of the legislature and of the judges that certain large operations in goods which interfered with the more ordinary course of trade were injurious to the public; they were held criminal accordingly. But early in the reign of George

III. the mind of the legislature showed symptoms of change in this matter, and the penal statutes were repealed (12 Geo. 3, c. 71), and the common law was left to its unaided operation. This repealing statute contains in the preamble the statement that it had been found by experience that the restraint laid by several statutes upon the dealing in corn, meal, flour, cattle, and sundry other sorts of victuals, by preventing a free trade in the said commodities had a tendency to discourage the growth and to enhance the price of the same. This statement is very noteworthy. It contains a confession of failure in the past; the indication of a new policy for the future. This new policy has been more clearly declared and acted upon in the present reign; for the legislature has by 7 and 8 Vict. c. 24, altered the common law by utterly abolishing the several offences of badgering, engrossing, forestalling and regrating. At the same time this repeal was accompanied by a proviso that nothing in the act contained should apply to the offense of knowingly and fraudulently spreading or conspiring to spread any false rumor with intent to enhance or decry the price of any goods or merchandise, or to the offense of preventing or endeavoring to prevent by force or threats any goods, wares, or merchandise being brought to any fair or market, but that every such offence might be punished as if this act had not been made."

Now it will be observed that the acts of George III. referred to, were enacted in 1772, and that the statutes of 7 and 8 Vict. repealing the prohibition against engrossing, forestalling, etc., were enacted in 1844. These repealing acts of the English Par-

liament were therefore long subsequent to the fourth year of James I., and hence can have no bearing when applied to the law of this state, for it was the common law and acts of parliament in aid thereof as existing in 1607, and not beyond that date, that have been approved and enacted by the legislature of Colorado. It must remain the law of this state until modified or repealed by our own law-making power. So far then, as applied to this jurisdiction, the said acts of parliament, in that case relied on by Lord Fry, could not, and do not, change the status of the common law in Colorado.

It will thus appear that the reasoning of a majority of the court in that case, one by a judge in absolute disagreement with the conclusion announced, and by another basing his conclusion upon the state of the law as then existing in England (1884), but wholly different from the status of the law here, tend very strongly to weaken if not to destroy, the force of that authority as against the case at bar, but rather to support it.

We are supported in this conclusion, in the case of *Standard Oil v. U. S.*, 221, U. S. 55 L. Ed. 619, in which Chief Justice White, after tracing the origin and extension of meaning of the term monopoly from its original acceptation, as to a grant of the crown extending exclusive privilege, to the final inclusion of other offences, such as forestalling, regrating and engrossing says:

"As monopoly, as thus conceived, embraced only a consequence arising from an exertion of sovereign power, no express restrictions or prohibitions obtained against the creation by an individual of a monopoly as such. But as it was con-

sidered, at least, so far as the necessaries of life were concerned, that individuals, by the abuse of their right to contract, might be able to usurp the power arbitrarily to enhance prices (one of the wrongs arising from monopoly), it came to be, that laws were passed relating to offenses such as forestalling, regrating, and engrossing by which prohibitions were placed upon the power of individuals to deal under such circumstances and conditions as, according to the conception of the times, created a presumption that the dealings were not simply the honest exertion of one's right to contract for his own benefit, unaccompanied by a wrongful motive to injure others, but were the consequences of a contract or course of dealing of such a character, as to give rise to the presumption of an intent to injure others through the means, for instance, of a monopolistic increase of prices. This is illustrated by the definition of engrossing found in the statute, 5 and 6 Edw. VI. chap. 14, as follows:

'Whatsoever person or persons * * * shall engross or get into his or their hands by buying, contracting, or promise-taking, other than by demise, grant, or lease of land, or title, any corn growing in the fields, or any other corn or grain, butter, cheese, fish, or other dead victuals, whatsoever, within the realm of England to the intent to sell the same again, shall be accepted, reputed, and taken an unlawful engrosser or engrossers.'

As by the statutes providing against engrossing the quantity engrossed was not required to be the whole or a proximate part of the whole of an article, it is clear that there was a wide difference between monopoly and engrossing, etc. But as the

principal wrong which it was deemed would result
from monopoly, that is, an enhancement of the price,
was the same wrong to which it was thought the
prohibited engrossment would give rise, it came to
pass that monopoly and engrossing were regarded
as virtually one and the same thing. In other words,
the prohibited act of engrossing, because of its in-
evitable accomplishment of one of the evils deemed
to be engendered by monopoly, came to be referred
to as being a monopoly or constituting an attempt
to monopolize. Thus Pollexfen, in his argument in
*East India Co. v. Sandys,* Skinner, 165, 169, said:

'By common law, trade is free, and for that cited
3 Co. Inst. 181; F. B. 65; *Taylor's de Ipswich v.
Sherring,* 1 Rolle, Rep. 4; that the common law is as
much against monopoly as engrossing; and that they
differ only that a monopoly is by patent from the
King, the other is by the act of the subject between
party and party; but that the mischiefs are the
same from both, and there is the same law against
both. *Darcy v. Allen,* F. Moore, 673, 11 Coke, 84.
The sole trade of anything is engrossing *ex rei
naturae,* for whosoever hath the sale or trade of buy-
ing and selling hath engrossed that trade; and who-
soever hath the sole trade to any country hath the
sole trade of buying and selling the produce of that
country, at his own price, which is an engrossing.'

And by operation of the mental process which
led to considering as a monopoly acts which, al-
though they did not constitute a monopoly, were
thought to produce some of its baneful effects, so
also because of the impediment or burden to the
due course of trade which they produced, such acts
came to be referred to as in restraint of trade. This

is shown by Lord Coke's definition of monopoly as being 'an institution or allowance  *  *  *  whereby any person or persons, bodies politic or corporate, are sought to be restrained of any freedom or liberty that they had before, or hindered in their lawful trade.'

It is illustrated by the definition which Hawkins gives of monopoly wherein it is said that the effect of monopoly is to restrain the citizen 'from the freedom of manufacturing or trading which he had before.' And see especially the opinion of Parker, C. J., in *Mitchel v. Reynolds* (1711) 1 P. Wms. 181, where a classification is made of monopoly which brings it generically within the description of restraint of trade.

Generalizing these considerations, the situation is this: 1. That by the common law, monopolies were unlawful because of their restriction upon individual freedom of contract and their injury to the public. 2. That as to necessaries of life, the freedom of the individual to deal was restricted where the nature and character of the dealing was such as to engender the presumption of intent to bring about at least one of the injuries which it was deemed would result from monopoly—that is, an undue enhancement of price. 3. That to protect the freedom of contract of the individual, not only in his own interest, but principally in the interest of the common weal, a contract of an individual by which he put an unreasonable restraint upon himself as to carrying on his trade or business was void. And that at common law the evils consequent upon engrossing, etc., caused those things to be treated as coming within monopoly and sometimes

to be called monopoly, and the same considerations caused monopoly, because of its operation and effect, to be brought within and spoken of generally as impeding the due course of, or being in restraint of trade.''

The purpose of the learned judge in such a review of the subject was to arrive at an intelligent meaning to be given to the generic terms used in the federal act of 1890, which he was then interpreting, and to show what was the understanding of congress at that date, as to the common law in this country and in that respect.

The case of the *United States v. Addystone Pipe and Steel Co.*, 85 Fed. 271, is cited by counsel for appellant in support of its contentions. This was a proceeding in equity by a petition filed by the attorney general on behalf of the government against certain corporations charging combination and conspiracy in unlawful restraint of interstate commerce under the act of 1890. This case is important in its bearing here only that it sustains the conclusion that the acts charged, are in restraint of trade, and are unlawful; for in that case Judge Taft, speaking for the court, quotes with approval from the Massachusetts case of *Alger v. Thatcher*, 19 Pick. 51, as follows:

''The unreasonableness of contracts in restraint of trade and business is very apparent from several obvious considerations: (1) Such contracts injure the parties making them, because they diminish their means of procuring livelihoods and a competency for their families. They tempt improvident persons, for the sake of present gain, to deprive themselves of the power to make future acquisitions; and they

expose such persons to imposition and oppression. (2) They tend to deprive the public of the services of men in the employments and capacities in which they may be most useful to the community as well as themselves. (3) They discourage industry and enterprise, and diminish the products of ingenuity and skill. (4) They prevent competition and enhance prices. (5) They expose the public to all the evils of monopoly; and this especially is applicable to wealthy companies and large corporations, who have the means, unless restrained by law, to exclude rivalry, monopolize business, and engross the market. Against evils like these, wise laws protect individuals and the public by declaring all such contracts void."

And in an exhaustive review of the authorities, in the Pipe Line case the court concludes:

"Upon this review of the law and the authorities we can have no doubt that the association of the defendants, however reasonable the prices they fixed, however great the competition they had to encounter, and however great the necessity for curbing themselves by joint agreement from committing financial suicide by ill-advised competition, was void at common law, because in restraint of trade, and tending to a monopoly."

Again that court approved this language in the *People v. Sheldon*, 139 N. Y. 251.

"If agreements and combinations to prevent competition in prices are or may be hurtful to trade, the only sure remedy is to prohibit all agreements of that character. If the validity of such an agreement was made to depend upon actual proof of public prejudice or injury, it would be very dif-

ficult in any case to establish the invalidity, although the moral evidence might be very convincing.'' This last case was one charging criminal conspiracy.

It might be pertinent to ask how such combinations may be successfully prevented except by a court of equity in a proceeding of the character now under consideration. Certainly it is not reasonable to believe that they can be prevented by simply holding such agreements void and unenforcible as between the conspirators, for upon this principle monopoly would run riot and the public suffer so long as the beneficiaries or conspirators or a portion of them, can agree among themselves. This position is untenable and contrary to sound reason and justice.

The Addystone Pipe and Steel case does not decide as counsel contends, that agreements in restraint of trade are simply void and non-enforcible, and that there is no civil or criminal remedy at common law. That question was not in the case and it was not necessary to so decide, and the court did not pretend to do so, for the action was under the statute which provides specifically for the procedure and the penalties. Whatever language there may be in that opinion tending to support the contention of appellants was therefore mere obiter and to give the language more weight is to violate the first canon for the construction of a judicial opinion, laid down by Chief Justice Marshall in *Cohen v. Virginia,* 6 Wheat. 264:

''It is a maxim, not to be disregarded, that general expressions in every opinion are to be taken in connection with the case in which those expres-

sions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason for this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all cases is seldom completely investigated."

We must look, therefore, to cases in the courts wherein the precise or related question is involved, for precedent and guidance.

Much has been said as to whether the doctrine applicable to agreements in restraint of trade and monopolies in trade, should be restricted to articles of prime necessity. It will be seen that the court in the case last under discussion, take the view that it should not be so limited, as do many other cases cited, while still others are to the contrary. It would seem that under modern conditions and under the more recent decisions, this doctrine is held not to be justified. This would appear to be further supported by the fact that the acts of congress, and of the several states, upon this subject, apply alike to all agreements or combinations in restraint of trade, the tendency of which is toward monopoly. But that question, may be omitted from this discussion for it will not be denied that the articles involved in this cause are of prime necessity.

The only case cited by counsel for appellants from our own courts is *Master Builders' Association v. Domascio,* 16 Colo. App. 25. This was also an action by an individual master builder for damage

and injunction against an association of master builders. If it bears any relation to the subject matter now being considered it is simply to reiterate the well known principle of the right of freedom of trade, which the agreements in this cause are charged with obstructing and preventing.

It but illustrates the tendency of courts to get away from unreasonable distinctions, to say that of the cases cited by counsel for appellants, in support of their contention, that agreements in restraint of trade are merely void and unenforcible and therefore cannot be either punished or prevented at common law, that *Ladd v. Southern Cotton Press Co.,* 53 Tex. 172, and *Seeligson v. Taylor Compress Co.,* 56 Tex. 219, have been overruled by the case of *Texas Standard Oil Co.,* 83 Tex. 650. The latter case, however, was a suit upon an agreement and in which it was not necessary for the court to go further than to hold the agreement void. But the case is valuable for its discussion of the grave injury and danger to the public interest and public welfare, and as tending to show that public necessity demands both the punishment for, and prevention of such agreements. Also in the case of *Firemans' Ins. Co.,* a New Jersey case, reported in 61 Atl. 705, strongly relied on in appellants original brief, but which, as counsel for appellants point out in their supplemental brief, has been on appeal, expressly overruled by the New Jersey court of errors and appeals, reported in 73 Atl. 80, and which case seems to be in entire harmony with the contention of the people in this case. That case also serves to illustrate the distinction between the class of cases involving either personal actions for damages and injunction, or

those directly involving the validity of the contract, and that class of cases wherein the state at the instance of the attorney general seeks to enjoin such combinations and agreements upon the ground of public interest.

All the authorities seem to agree that under the common law and in a case of the character of the one at bar, the agreements are void as contrary to public policy and hence unlawful. But some of the cases hold that while such agreements are unlawful, yet they are not unlawful in a positive sense. Just how a thing can be unlawful, and at the same time not unlawful in a positive sense, is not very clear to the average mind. The discoverer of this theory must have been by one of a very rare and discriminating mind, having at least the learning attributed to Hudibras, who "could distinguish, and divide a hair 'twixt south, and south-west side." But it must be conceeded that where this theory has been approved, it was as a rule only in such cases as have been instituted by individuals or corporations as involving personal rights, such as the Mogul Steamship case, and cases based upon that authority, and not upon the complaint of the state. For as was well said in *Firemans' Ins. Co.*, 73 Atl. *supra*:

"* * * We should say that the fault we find with the Vice Chancellor's conclusion is not in the soundness of the rule of mere unenforceability as applied to the class of cases in which it properly obtains, but in the extension of such rule to a subject not properly, or at all, within its purview, viz.: the right of the state to preventive relief in aid of public policy. There is something startling, not to say appalling, in the proposition that the state is to

be met in its courts with a denial of its right to relief, upon the ground that the rule of non-intervention that is applied to the violators of such public policy, must also be applied to the public that is injured by such violation.

The rule in question_is itself an application of the maxim 'in pari delicto, etc.,' and hence is in strict analogy with the judicial policy, by force of which courts decline to aid in the distribution of plundered property, but it is quite illogical to say to the man who has been despoiled, 'Because we refuse our aid to those who despoiled you, therefore we must decline to aid you.' Yet this, or something very like it, is what we are asked to say.    *   *   *

Speaking for myself, the extension of the rule of non-enforcibility, based as it is upon the maxim in pari delicto, to the case of the state seeking to prevent public injury, seems to be without the slightest foundation in sound logic, or justification in right reasoning. Be this as it may, the fact is that, if upon neither of these grounds preventative relief may be had by the state, no combination can be so hostile to the public interests, or so flagrant in its defiance of public policy, but that it may effectively shield itself from such interference on behalf of the public, by the simple device of casting its proposed violation of public policy in the form of a contract for a self-imposed restraint of trade. I cannot believe that this is the actual state of our jurisprudence on this vitally important subject.

Concluding, as we do, that the line of reasoning that limits the court of chancery, in all cases involving contracts in restraint of trade, to the single policy of their non-enforcement is fundamentally at

fault, and that the defendants have not by their violation of public policy effectually entrenched themselves outside the pale of preventive law, it remains to be considered whether certain facts that were merely assumed in the court below, viz.: that the contract in question is one that fixes rates and stifles competition, and is detrimental to the public, are sustained by the testimony.''

But we do not believe that the contention of appellants in this case was ever the rule of the common law as adopted in this country, when its power was invoked on behalf of the government.

It will be necessary to review at some length, the authorities as to the doctrine of the common law upon this point, to learn whether or not the case of *Firemans' Ins. Co., supra,* finds support in these authorities or whether it rests upon the conclusion of that court alone. In this it will be well to bear in mind Blackstone's definition, that law is a rule of action commanding what is right and prohibiting what is wrong. From this we learn that the law is a rule of action, not inaction. That it not only declares a wrong, but prohibits it. Also that the author in his analysis of the common law lays down the unequivocal maxim that where there is a right there is a remedy.

Mr. Eddy in his work on combinations says: ''It is the glory of the common law that its fundamental conceptions are sufficiently elastic to cover the rapidly developing relations and conditions of a progressive society, and it would be strange indeed if in this latter end of the nineteenth century relations and conditions developed of a character so new and novel that the fundamental principles of

the common law were found either inapplicable or inadequate to control. The common law is a complete philosophy of legal relations, and as such must necessarily embrace and provide for every contingency that can possibly arise in the development of society. It is not a code, nor is it so much a science as a philosophy, and as a philosophy in its development it keeps pace with the development of man himself, so that whatever man does for or against his fellow-man finds its approval or condemnation in the common law. The very phrase 'common law' in its broadest significance means the law common to all men; that is, those rules of conduct of such universal validity that they are common to all men; and the common law would be a petrification indeed if it were possible for man to devise a new conduct or a new relation which would not be covered comprehensively by some fundamental principle of the common law." § 336.

We have seen that the offense of engrossing was a part of the common law adopted by our statute. Of this offense Hawkins says:

"All endeavors whatsoever to enhance the common price of any merchandise, and all kinds of practices which have an apparent tendency thereto, whether by spreading false rumors or by buying things in a market before the accustomed hour, buying or selling again the same thing in the same market, or by any such like devices, are highly criminal at common law, and that all such offences anciently came under the general notion of forestalling, which includes all kinds of offenses of this nature. And surely there can be no attempt of this kind, but must be looked upon as a high offense against the

public, inasmuch as it so apparently tends to put a check upon trade, to the general inconvenience of the people, by putting it out of their power to supply themselves with a commodity, without an unreasonable expense which often proves oppressive to the poorer sort, and cannot but give just cause of complaint to the richest.   If such practices were allowable, a rich man might engross into his hands a whole commodity, and then sell it at what price he should see fit; which is of such dangerous consequence, that the bare engrossing of a whole commodity, with intent to sell it at unreasonable prices, is .an offense indictable, at common law, whether any part thereof is sold by the engrosser or not.   It is said that by the ancient statute the offender was to be 'grievously amerced for the first offense; for the second, to be condemned to the pillory; for the third, to be imprisoned; and for the fourth, to be compelled to abjure the vill.'   And there seems to be no doubt, but at this day all offenders of this kind are liable to a fine and imprisonment, answerable to the heinousness of their offense, and upon an indictment at common law."   2 Hawkins' Pleas of the Crown, 317, 318, 319.

And again:  "The prohibiting of conspiracies to raise the price of victuals."   This depends upon 2 and 3 Edward VI., ch. 15, by which it is enacted:

'That, if any butchers, brewers, baker, poulterers, cooks, costermongers, or fruiterers, shall conspire, covenant, promise, or make oaths, that they shall not sell their victuals but at certain prices; or if any artificers, workman, or laborers, do conspire, promise, or covenant together, or make any oaths that they shall not make or do their works but at a

certain price or rate; or shall not enterprise, or take upon them to finish what another hath begun, or shall do but a certain work in a day or shall not work but at certain hours and times; every such person so conspiring, etc., shall forfeit for the first offense ten pounds; and if he pay not the same within six days, shall suffer twenty days imprisonment; and for the second offense shall forfeit twenty pounds, etc., and for the third, forty pounds, etc. And if any such conspiracy, covenant or promise, be made by any society, brotherhood, or company, of any craft, mystery, or occupation of the victuallers above mentioned, with the presence or consent of the more part of them, that then immediately upon such act of conspiracy, etc., over and besides the particular punishment before appointed, their corporations shall be dissolved." Id. 320.

So Blackstone: "Combinations among victuallers or artificers, to raise the price of provisions, or any commodities, or the rate of labor, are in many cases severely punished by particular statutes; and in general by statute 2 and 3 Edward VI., ch. 15 (1550), with the forfeiture of ten pounds or twenty days' imprisonment, with an allowance of only bread and water for the first offense; twenty pounds or the pillory, for the second; and forty pounds for the third, or else the pillory, loss of one ear, and perpetual infamy. In the same manner by a constitution of the Emperor Zeno, all monopolies and combinations to keep up the prices of merchandise, provisions or workmanship, were prohibited under pain of a forfeiture of goods and perpetual banishment." 4 Blackstone's Commentaries, 160.

In a review of many cases and considering the

question of conspiracy, it was said in a very celebrated case:

"These cases were before the colonization * * * and they furnish the leading principles of the doctrine of conspiracy, of which the subsequent decisions are but the practical applications, and must be received as expositions of the law as it before existed, and not as creating a new law or altering the old one, which only could be done by legislative enactment, and cannot be assimilated to occasional alterations or changes in the practice of courts, in relation to the form of proceedings, which are only creatures of the courts, and often go on mere fiction. And it is a mistake to suppose they are expansions of common law, but always existing and attaching to whatever particular matter or circumstance may arise and come within the one or the other of them; not that this or that combination is, by the common law, in terms declared to be an indictable conspiracy, but that it falls within the principles of the common law which have for their object the preservation of the social order, in the punishing of such combinations as are calculated to threaten its well being. Precedents, therefore, do not constitute the common law, but serve only to illustrate its principles."—*State v. Buchanan,* (Md.) 9 Amer. Dec. 534.

Mr. Bishop in his work on criminal law says:

"If the question were one of legislation, it would be debatable ground whether a particular good would come from the enactment of a statute to meet this kind of wrong. But where the question is, not what law shall be made, but whether a particular provision of the English common law is common law with

us, we inquire only whether the wrong to be suppressed by the provision is a wrong with us, the same as it was with the people of England at the time of the emigration of our forefathers to this country. And plainly the principle of the thing is the same here as it was there then. And Mr. Dane observes: 'The common law against the offenses of forestalling, engrossing, and regrating and monopolies, has borne the test of ages, and has been wise and useful. The fault has not been in this law in the United States, but in the non-execution of it. Its notorious violations have often been complained of, but scarcely in any instance prosecuted; partly owing to the difficulty there has ever been in defining and proving these offenses; and, therefore, the possible failure of prosecutions when commenced; but not wholly to this cause, for this difficulty is nearly the same in every country; yet in many countries in Europe, and in which there is a tolerable share of freedom, this kind of law has usually been tolerably well executed. But the principal causes to which the inexecution of this portion of the common law is owing, in the United States, is the easy and indulgent temper and character of the people generally, who have ever been disposed to suffer themselves to be cheated and imposed upon in these ways, by these kinds of offenders, in hundreds of instances, complaining generally, but never prosecuting.''—7 Dane Abridg. 30.

Let us now take a view of these several offenses as they appear in the English common and statutory law as it stood at the time this country was settled.

"Every practice or device by art, conspiracy,

words, or news, to enhance the price of victuals or other merchandise, has been held to be unlawful; as being prejudicial to trade and commerce, and injurious to the public in general." 1 Russell on Crimes, 168. The author goes on to say:

"It has been sometimes contended, that forestalling, regrating, and engrossing were punishable only by the provisions of these statutes; but that doctrine has not been admitted, and they still continue offenses at common law; though their precise extent and definition at the present day may perhaps admit of some doubt. In this country where the statute of 5 and 6 Edward VI. ch. 14, has not been repealed, we have not the same doubt, whether these are common law offenses."—1 Bishop on Criminal Law, 522.

Bacon discussing the subject of forestalling says:

"All unlawful endeavors to enhance the price of any commodity, practices so prejudicial to trade and commerce, and injurious to the public in general, came under the notion of forestalling, which includes engrossing, regrating, and all other offenses of like nature. It is punishable by fine and imprisonment, answerable to the heinousness of the offense, upon an indictment at common law. * * *" The author then recites the provisions of the statute 5 and 6 Edward VI. ch. 14 as before quoted.— Vol. 4, Bacon's Abridgement, 335.

In a consideration of the statutes of 5 and 6 Edward VI. as being within the act of the Colorado legislature of 1861 Revised Statutes § 6295, 1908, in that it was of general nature, and therefore,

adopted by our legislature, and now in force, our supreme court has said:

"The general rule that a general statute does not repeal a special or a particular statute does not apply for the reason that the statute of Edward VI. cannot be said to be either a special or particular statute. Had it been of such a nature, it would not have been brought to the shores of this continent by the early colonists from England, nor would it, as a part of the common law, ever have become the rule of decision in any part of this country. This point was made by the relator upon the argument, and authorities were cited to show that the statute of Edward VI. was regarded as public law in England; and the judges, ex officio, took notice of it, and because it was a general law and not local or special, it, with other general laws of that country, became the rule of decision on this side of the Atlantic, prior to its adoption by state conventions and prior to its enactment by state legislatures. It was this characteristic that brought it within the adopting act of the Colorado legislature of 1861, which declared the common law of England, so far as the same was applicable and of a general nature, and all acts of the British parliament made in aid of or to supply defects of the common law prior to the fourth year of James the First, (with certain exceptions,) and which were of a general nature and not local to that kingdom, should be the rule of decision here, and should be considered of full force until repealed by legislative authority."—*People ex rel. Goddard*, 8 Colo. 432, 434.

Mr. Justice Harlan in *Arthur v. Oakes*, 63 Fed. 310, declares:

"According to the principles of the common law, a conspiracy upon the part of two or more persons, with the intent by their combined power to wrong others, or to prejudice the rights of the public, is in itself illegal, although nothing be actually done in execution of such conspiracy. This is fundamental in our jurisprudence. So a combination or conspiracy to procure an employe or body of employes to quit a service in violation of a contract of service, would be unlawful, and in a proper case might be enjoined, if the injury threatened would be irremediable at law. It is one thing for a single individual, or for several individuals, each acting upon his own responsibility and not in co-operation with others, to form the purpose of inflicting actual injury upon the property or rights of others. It is quite a different thing, in the eye of the law, for many persons to combine or conspire together with the intent, not simply of asserting their rights or accomplishing lawful ends by peaceful methods, but of employing their united energies to injure others or the public. An intent upon the part of a single person to injure the rights of others or of the public is not of itself a wrong of which the law will take cognizance, unless some injurious act be done in execution of the unlawful intent. But a combination of two or more persons with such an intent and under circumstances that give them, when so combined, a power to do injury they would not possess as individuals acting singly, has always been recognized in itself as wrongful and illegal."—*Arthur v. Oakes,* 63 Fed. 321, 322.

He there quotes with approval from *State v. Stewart,* 59 Vt. 273; 9 Atl. 559, as follows:

"A combination of two or more persons to effect an illegal purpose, either by legal or illegal means, whether such purpose be illegal at common law or by statute, or to effect a legal purpose by illegal means, whether such means be illegal at common law or by statute, is a common law conspiracy. Such combinations are equally illegal whether they promote objects or adopt means that are per se indictable, or promote objects or adopt means that are per se oppressive, immoral, or wrongfully prejudicial to the rights of others. If they seek to restrain trade, or tend to the destruction of the material property of the country, they work injury to the whole people."

It will be seen from these authorities that combinations for the purpose and of the character as in the case at bar are conspiracies, illegal at common law in the positive sense, as that term has been used, in that, they were prohibited at common law and 'by acts and statutes of the British Parliament made in aid of, or to supply the defects of common law,' and as such, made the rule of decision, and of full force in this state by the adopting act of 1861, and in that, such conspiracies are, by our own statute, made criminal and indictable.

Our conspiracy statute provides, 1 Mills, Ann. § 1294:

"If any two or more persons shall conspire or agree falsely and maliciously to charge or indict, or cause or procure to be charged or indicted, any person for any criminal offense, *or shall agree, conspire or co-operate to do, or to aid in doing any other unlawful act,* each of the persons so offending shall on conviction be fined in any sum not exceed-

ing one thousand dollars, and imprisoned not less than three months nor exceeding two years.''

It has been shown that at the common law the acts charged in the complaint are unlawful; that these constitute unlawful acts. Then under our own statute, and being unlawful they are punishable as crimes. It is difficult, therefore, to see how these agreements and acts could be made unlawful in a more specific sense. The case of *C. W. & V. Coal Co. v. The People,* 214 Ill. 421, is a very helpful case and supports this view. The court in that case enters into a most exhaustive review of the authorities. It was an indictment against coal corporations charging them with conspiracy, the object whereof was unlawful, but did not set out the means whereby the conspiracy was to be accomplished. There were four counts in the indictment, two predicated upon the common law and two under the statute of Illinois. The court sustained the indictment in toto. It held among other things, that a combination between independent producers of coal to prevent competition in its sale is inimical to trade and commerce, detrimental to the public and unlawful, and amount to a common law conspiracy, regardless of what may be done in furtherance of the conspiracy, and that the common law upon the subject of regulating and fixing prices of a commodity was not abrogated in Illinois by the adoption of §§ 46 and 130 of the Criminal Code, the one section relating to conspiracy to do an illegal act, and the other to influencing or attempting to influence the price of a commodity, or corner the market therefor. It was further held that the fact that a combination to fix the prices of a commodity and prevent competition among its

members does not include a complete monopoly of the trade in the territory in which the members transact business, does not relieve the members from criminal responsibility in forming the combination.

It will be noted that the basis of the decisions restraining unlawful acts of labor unions and members of the same, is the injury that may result to the public at large. And figuratively and numerically speaking these cases in our courts are as the leaves on the trees. Whether or not we may agree that in such cases there is a correct application of the principle of public concern, yet it is only upon such principle, that this class of cases is sustained at all. It would, therefore, be a singular conception of our law and of justice that would deny like injunctive relief to the public in a case like this, wherein an unlawful conspiracy is charged that, to an equal or greater extent, affects the public interest. For such a conspiracy and such acts affect not only the right of freedom of trade among its members and of the public at large, but also the right to procure sustenance at a fair price and, therefore, and to that extent, affecting the very right of the public to exist at all.

But because conspiracies or combinations may be criminal at common law or under the statute, it does not follow that they may not be enjoined in equity. In speaking of the jurisdiction of a court of equity in cases of this kind it is said, that:

"This jurisdiction is founded upon the ability of equity to prevent irreparable mischief and vexatious litigation and to furnish a more complete remedy than can be had at law. The remedy by indictment for a public nuisance is not an adequate remedy

at law precluding the remedy of injunction."—21 Am. and Eng. Enc. of L. 703.

"Courts of equity are reluctant to use the process of injunction where the remedy by indictment and information is effacacious, but will not hesitate where the remedy is not adequate and it is necessary to protect the rights of the public or an individual. A court is not powerless to prevent.the doing of an act merely because it is denounced as a public offense."—*State v. Lindsay,* 85 Kas. 79, 116 Pac. 207; also *State v. Rabinowitz,* (Kas.) 118, Pac. 1043, and in many authorities therein cited.

The case of *Door Co. v. Fuelle,* 215 Mo. was an action to enjoin the Union of Brotherhood of Carpenters and Joiners from enforcing an alleged boycott. In that case while the court held that the Union of Brotherhood of Carpenters and Joiners and their allied associations, were not combinations in unlawful restraint of trade, but were legal and highly laudable when confined within proper bounds. Yet it was held that the complaint.clearly stated a cause for equitable relief. The court said:

"It is conceded that courts of equity have jurisdiction to restrain conspiracies of this character when irreparable injury is sure to follow. Suits at law would be inadequate, and a multiplicity of suits at law would arise.   *   *   *   This right must be maintained, or personal liberty is a sham."

The opinion in that case contains an exhaustive review of authorities sustaining the right to injunctive relief when either the right of the individual or the public interest is affected, and which would be but repetition to cite here, but which seems convincing and conclusive.

*Gatzow v. Buening,* 106 Wis. 1, was an action in damages against a combination of liverymen to limit their services to persons patronizing them exclusively, and to monopolize the livery business in Milwaukee, including service for funerals, etc.

The court said:

"Such a combination is none the less unlawful because existing under a self-imposed constitution and governed by by-laws and conducting its operations in a public or semi-public way; and the fact that they acted in accordance with their obligations to the association will constitute no protection to its members as regards liability for compensatory damages to a person specially injured by their overt acts done in pursuit of the purposes of the organization."

In that case the court used the following very significant language:

"This is an age of trusts and combinations of all sorts. There is clamor against them on the one hand, and for the privilege of combining upon the other, as if the law could be changed to fit the opinions and selfish ends of particular classes. There is clamor for laws to prevent combinations, while law exists that condemns most of them, which is as old as the common law itself, and sufficiently severe to remedy much of the mischiefs complained of that is actual; yet violations of such law are so common, and the remedy it furnishes so seldom applied, that its very existence seems, in many quarters, to be little understood. In *Reg. v. Druitt,* 10 Cox, Cr. Cas. 593, it was held that any combination of persons to stifle and prevent the free use of labor or capital within legitimate bounds is unlawful, and that

the law furnishes a remedy therefor.  The liberty of a man's mind and will to say how he shall bestow himself and his means, his talents, and his industry, is as much the subject of the law's protection as is his body.''

The opinion of Chief Justice Ryan in the case of *Attorney General v. Railroad Companies,* 35 Wis. 425, is one showing very thorough research by that learned judge, and goes far to establish the contention of the attorney general in this case, as to the right of the people of the state to injunctive relief at the instance of the attorney general in such cases. Judge Ryan there contrasts the almost universal rule of the English courts since the reign of Elizabeth and of the then (1876) hesitancy and seeming doubt of the American courts, whose decisions he characterizes as being somewhat 'veiled in learned obscurity.'  That case was an action of the attorney general praying writs of injunction to restrain the defendants. railroad companies, from charging fares and freight rates in excess of the maximum established by the statute.

It was the contention of the defendants there, that ''the court has no jurisdiction to grant the injunction sought.  (1) The purpose of the suit is to enforce by injunction a criminal law of the state. There is no complaint of individual or special injury, but the action is based wholly on the violation of a public penal statute by the defendant, and the only relief asked is by an injunction to prevent such violation.  By the general principles of equity jurisprudence, chancery has no jurisdiction to grant an injunction for such a purpose.''

The same contention in substance is made here except that the law violated is not LEX SCRIPTA, but LEX NON-SCRIPTA, and that the acts charged as we have here, are unlawful both in a civil and a criminal sense. After pointing out that the almost universal trend of authority both in this country and in England, is to sustain equitable jurisdiction in case of private wrong, Judge Ryan says:

"In such cases, public wrong may be considered only as an aggregation of private wrongs. And, the jurisdiction once established to enjoin private wrong, in each case, at the suit of the person wronged, it is almost a logical necessity to admit the other branch of the jurisdiction, to enjoin, at the suit of the state such a general wrong, common to the whole public, as interests the state, and could be remedied by private persons by a vast multitude of suits only, burdensome to each and impracticable for very number; more conveniently, effectively, and properly represented by the attorney general as *parens patriae*. But jurisdiction of informations of this nature has sometimes been denied here, courts of equity in this country, singularly enough, being sometimes more timid to control corporate power, and less willing to protect the public against corporate abuse, than the English chancery. In both branches of the jurisdiction, it proceeds as for quasi nuisance; and it is difficult to understand why the jurisdiction should be asserted as to private nuisance and denied as to public nuisance; why for the same cause, individuals should have a remedy, denied to the aggregate of individuals, called the public. But, as we remarked before, in this regard the judicial voice in America is less certain in tone than

in England.   We should be willing to follow the
English rule, in this state, unless there were a pre-
ponderance of American authority against it.   But
fortunately we find this wholesome jurisdiction sus-
tained here by the great weight of authority, and,
with modern experience, we deem it only a question
of time when it must be universally asserted and ex-
ercised.

In *Bigelow v. Hartford Bridge Co., supra*,
Storrs, J., said, among other things:

"Indeed it is upon the ground of particular in-
jury to the plaintiff, distinct from what he suffers
in common with the rest of the public, that all ap-
plication for injunctions against what is a public
nuisance are sustained.   And there is no good rea-
son why, apart from such special injury, relief should
be granted in this mode at the instance of a particu-
lar individual.   Courts of equity, in this respect,
proceed on the principle which prevails in courts of
law, that an action will not lie in respect of a pub-
lic nuisance, unless the plaintiff has sustained a
particular damage from it, and one not common to
the public generally.   To preserve and enforce the
rights of persons as individuals, and not as mem-
bers of the community at large, is the very object
of all suits, both at law and in equity.   The reme-
dies which the law provides in cases where the rights
of the public are affected, are ample and appropriate;
and to them recourse should be had when such rights
are violated.   The courts of equity in England will
indeed sustain informations, not by individuals, but
at the suit of the attorney general or the proper
crown officer for the purpose of abating public nui-
sances and what are termed pourprestures."   14

Conn. 578. This is not a very accurate statement of the jurisdiction, which does not go to abate, but to restrain, which is the very ground of it, as distinct from legal remedies. The court holds the jurisdiction in cases of private nuisance and of public nuisance inflicting particular injury, at the suit of an individual, and questions it, at the suit of the state. It is not easy to comprehend why the remedy should avail against the less evil, and not against the greater; why equity should interpose to restrain what affects one person only and refuse to protect against what affects all persons; in the case of a public nuisance, at the suit of one whom it especially aggrieves, and refuse to do so for the public whom it equally aggrieves. The reason assigned signally fails; for remedies at law reach private as well as public nuisances.''

It is said in Wood on the Law of Nuisances, page 61: ''All monopolies were regarded as nuisances at common law   *   *   *   and all persons engaged therein are punishable as for a common nuisance.''

Upon this ground of public nuisance was based the judgment of the court in the case of *Territory v. Long-Bell Lumber Co.* (Okla.), 99 Pac. 911.

It should be remarked that there was at the institution of that cause, a territorial act providing against combinations in restraint of trade, which the court held to be in force in the state of Oklahoma. But such act like all such acts, was but a reiteration of the common law upon that subject, except that the statute as is common in such cases, provided penalties alone and did not provide for equitable relief, and the public officer who instituted

the suit, was compelled to rely upon the common law to sustain his position, that such acts and combinations constituted a common nuisance, and as such was the subject of injunctive relief.

The definition of a common nuisance was quoted from 21 Am. and Eng. Enc. L., 683, as follows:

"A common or public nuisance is one that affects the people at large, and is a violation of a public right, either by a direct encroachment upon public property or by doing some act which tends to the common injury, or by omitting to do, in the discharge of a legal duty, that which the common good requires. It does not necessarily mean one affecting the government or the whole community of the state; it is public if it affects the surrounding community generally, or the people of some local neighborhood, as, for instance, the inhabitants of a village. Nor is it necessary that all persons in the community, or in fact that any individual whatever, should be actually annoyed or injured, but it is sufficient if there is a tendency to the annoyance of the public by an invasion of a right which all are entitled to exercise if they see fit." The court then proceeds to say:

"It will be noted that the petitions allege that the defendants have become members of a pool, trust, agreement, combination, and understanding with each other to regulate and fix the price of lumber, coal and grain and to prevent and restrict competition in the sale thereof, and that, by virtue of being thus federated together, have so controlled all the business of buying and selling such commodities in the town of Kingfisher as to create a monopoly for their benefit, and, by charging unjust,

unreasonable, exorbitant prices for these commodities, their acts have been and are greatly to the injury of the people of the county of Kingfisher and the territory of Oklahoma; that by means of said confederation, combination and monopoly, they are enabled to and do keep other persons desiring to enter said business from doing so, and arbitrarily fix the price which shall be paid for such commodities, and also the price at which they shall be sold to consumers, and that they have thereby completely excluded competition in these lines. Wood on Nui-. sances, § 51, says:

'All monopolies were regarded as nuisances at common law;' they have received the condemnation of legislatures and courts from the earliest times. Forestalling and engrossing in the purchase of commodities in common use were at an early date condemned by the English parliament being made punishable by fine and imprisonment, and courts have uniformly denied to parties to contracts in restraint of trade their remedies and relief.''

It will be seen that the complaint in the case at bar charges the defendants with an offense much more aggravated in its character, and vastly more general in the scope of its operation and effect than in the Oklahoma case. The right of the public in this respect is there clearly and with great force stated as follows:

''They have a right to have the current of their business affairs unobstructed and the atmosphere of their daily transactions unpolluted by monopolistic organizations destroying that free and open market to which all are entitled. The benefit of a free and open market, unhampered by secret com-

binations with the power by virtue of such to arbitrarily fix prices which those who enter it shall receive and shall be required to pay, is one of the most valuable rights which organized government offers a citizen, and it is a right not only of material value to the individual member in his personal capacity, but it is a right which he is entitled to enjoy as a member of the community in which he lives in common with all of his other rights.  Any invasion of this right in the manner indicated by these suits is an invasion of a public right, one which all the citizens of a community should be permitted to enjoy by reason of being law-abiding members of such community and loyal citizens of the state.  That combinations such as are here proceeded against are invasions of this public right and of the interests of the public; and that such acts are so recognized, is declared by numerous authorities.''

The case of the *People v. Aachen and Munich Fire Ins. Co.*, 126 Ill. App. 636, was an action to enjoin more than one hundred fire insurance companies from enforcing a conspiracy and agreement to increase the rates of insurance in that state.  In that case it was specifically urged (1) ''It is the province of the legislative department, and not of the judicial, to prescribe the public policy of the state as to various kinds of alleged combinations.  The General Assembly has designated at various times (see statutes) what combinations or agreements are expressly prohibited in Illinois, and the courts may not add another class of agreements or any other form of agreement in the same class.  This is tantamount to legislation by the courts.''  In answer to this and after reciting the statute in that state as to

the adoption of the common law, of which our own statute heretofore set out, is a copy, the court said:

"While it is true that it is not the province of the judicial department to prescribe the public policy of the state, it is its duty to scan the law of the state, common as well as statutory, and to find the public policy therein, and to declare it as found. Broadly stated, whatever is violative of the law and injurious to the interest of the public is opposed to public policy, and whatever is violative of the law affecting the public interest is presumed to be injurious to the interest of the public."

It has been asserted that cases involving fire insurance rates are not applicable to this discussion because of the quasi public character of these corporations, but in that case exactly the opposite was urged and it was there contended: "III. Contracts of insurance are not affected with a public interest. Insurance companies are not public utility corporations, and the public, as a matter of right, are not entitled to insurance contracts from these appellees, and the bill does not claim or allege that the public is so entitled. No special franchise from the state is necessary to enable anyone to engage in the insurance business. Any individual may engage in it, and so may any corporation whose charter powers allow it."

But the court in answer to this says: "In *North American Ins. Co. v. Yates,* 214 Ill. 272, it is held that the business of insurance is a public necessity and is stamped with a public interest."

It was further held in that case that an injunction may issue at the instance of the attorney general, to restrain combinations in restraint of trade,

which tend injuriously to effect the public interest.

Counsel for appellants cite § 3924 R. S. of 1908, permitting the combination of employes for lawful purposes, and present the somewhat startling contention that "Thus our legislature has expressed itself in favor of combinations."

But that statute expressly limits such combinations to lawful purposes and particularly mentions some of the unlawful purposes for which such combinations may not be permitted, among which are "financial injury," "preventing or intimidating any other person from continuing in such employment as he may see fit," or "the boycott," all of which unlawful acts may well be considered as within the allegations of the complaint in the case at bar.

But even though that statute is capable of the construction appellants so seek to place upon it, then and in that case the statute is void, for it is clearly beyond the power of the legislature to grant the right of a combination, such as is charged in the complaint here.

For the right of freedom of trade belonging to every citizen, and the freedom from oppression by monopoly is such an inherent and constitutional right, that it may not only be protected by the courts, but it is not within the power of a legislature to deny it.   It was said by Mr. Justice Bradley in *Butchers Union Co. v. Crescent City Co.,* 111 U. S. 746, "But this concession does not in the slightest degree affect the proposition, which I deem a fundamental one, that the ordinary pursuits of life, forming the large mass of industrial avocations, are and ought to be free and open to all, subject only to such general regulation, applying equally

to all, as the general good may demand; and the grant to a favored few of a monopoly in any of these common callings is necessarily an outrage upon the liberty of the citizen as exhibited in one of its most important aspects, the liberty of pursuit. But why is such a grant beyond the legislative power and contrary to the Constitution? The 14th amendment of the Constitution, after declaring that all persons, born or naturalized, in the United States and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside, goes on to declare that 'No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the law.' I hold that a legislative grant, such as that given to the appellees in this case, is an infringement of each of these prohibitions. It abridges the privileges of citizens of the United States; it deprives them of a portion of their liberty and property without due process of law and it denies to them the equal protection of the laws.  *  *  *  In my opinion, therefore, the law which created the monopoly in question did abridge the privilege of all other citizens, when it gave to the appellees the sole opwer to have and maintain stock landings and slaughter-houses within the territory named, because these are among those ordinary pursuits and callings which every citizen has a right to follow if he will, subject of course, to regulations equally open to all.

"But if it does not abridge the privileges and immunities of a citizen of the United States to pro-

hibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it, it certainly does deprive him, to a certain extent, of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers; which, as already intimated, is a material part of the liberty of the citizen. And if a man's right to his calling is property, as many maintain, then those who had already adopted the prohibited pursuits in New Orleans, were deprived, by the law in question, of their property, as well as their liberty, without due process of law. But still more apparent is the violation, by this monoply law, of the last clause of the section 'No state shall deny to any person the equal protection of the laws. If it is not a denial of the equal protection of the laws to grant to one man or set of men, the privilege of following an ordinary calling in a large community, and to deny it to all others, it is difficult to understand what would come within the constitutional prohibition. Monopolies are the bane of our body politic at the present day. In the eager pursuit of gain they are sought in every direction. They exhibit themselves in corners in the stock market, and produce market and in many other ways. If, by legislative enactment, they can be carried into the common avocations and callings of life, so as to cut off the right of the citizen to choose his avocation; the right to earn his bread by the trade which he has learned; and if there is no constitutional means of putting a check to such enormity, I can only say that it is time the constitution was still further amended. In my judgment, the present constitution is amply sufficient for the protection of the

people, if it is fairly interpreted and faithfully enforced."

And Mr. Justice Field concurring in the same opinion, speaking of the inalienable rights of citizens as expressed in the Declaration of Independence, and as therein of the spirit and genius of the government, said:

"Among these inalienable rights, as proclaimed in that great document, is the right of men to pursue their happiness, which is meant the right to pursue any lawful business or vocation, in any manner not inconsistent with the equal rights of others, which may increase their prosperity or develop their faculties, so as to give to them their highest enjoyment.

The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves and have been followed in all communities from time immemorial, must, therefore, be free in this county to all alike upon the same conditions. The right to pursue them, without let or hindrance, except that which is applied to all persons of the same age, sex and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright." He then proceeds to quote from Adam Smith's Wealth of Nations, bk. 1, ch. 10:

"The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner

he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper.''

That great jurist then declared that:

''In this country it has seldom been held, and never in so odious a form as is here claimed, that an entire trade and business could be taken from citizens and vested in a single corporation. Such legislation has been regarded everywhere else as inconsistent with civil liberty. That exists only where every individual has the power to pursue his own happiness according to his own views, unrestrained except by equal, just and impartial laws. The act of Louisiana compelled more than a thousand persons to abandon their regular business and to surrender it to a corporation to which was given an exclusive right to pursue it for twenty-five years. What was lawful to these thousand persons, the day before the law took effect, was unlawful the day afterwards. With what intense indignation would a law be regarded that should, in like manner, turn over the common trades of the community to a single corporation. I cannot believe that what is termed in the Declaration of Independence, a God-given and an inalienable right, can be thus ruthlessly taken from the citizen, or that there can be any abridgement of that right except by regulations alike affecting all persons of the same age, sex and condition. It can not be that a state may limit to a specified number of its people, the right to practice

law, the right to practice medicine, the right to
preach the gospel, the right to till the soil or to pur-
sue particular business or trades, and thus parcel
out to different parties the various vocations and
callings of life. The first section of the 14th amend-
ment was, among other things, designed to prevent
all discriminating legislation for the benefit of some
to the disparagement of others, and when rightly
enforced as other prohibitions upon the state, not
by legislation of a penal nature but through the
courts, no one will complain.''

Who will say then, that a right so inherent and
sacred that it cannot be taken away, nor abridged
by legislative act, and a wrong so grevious that it
cannot be tolerated by legislative will, may not be
protected in the first instance and prevented in case
of the latter, by a court of equity in a country like
ours? Who will say in sound reason that courts are
so impotent and powerless? Yet these very things
are charged against the appellants in this case as
existing and as to continue to exist, by reason of
their agreement and conspiracy and we are asked
to conclude that the law will permit them to continue
to exist, regardless of private right and the public
interest, so long as the conspirators may be able to
agree among themselves.

It should be recalled that if we are correct in
our conclusion, that the acts charged in the complaint
and admitted by the demurrer, are unlawful in the
sense of constituting a public wrong, and as against
the public interest, then under our conspiracy stat-
ute these acts are made a crime and punishable as
such.

In the *Morris Run Coal Co. v. Barclay Coal Co.*,

68 Penn. St., 173, decided as early as 1872, and before there were any so-called anti-trust statutes in this country, a combination and conspiracy in restraint of trade in coal was then held to be unlawful and even criminal.  While this was an action in debt and in which the parties to the agreement only, were involved in the suit, yet the reasoning of the court in that case seems applicable in this. The court says:

"The effects produced on the public interests lead to the consideration of another feature of great weight in determining the illegality of the contract, to-wit: the combination. resorted to by these five companies.  Singly each might have suspended deliveries and sales of coal to suit its own interests, and might have raised the price, even though this might have been detrimental to the public interest. There is a certain freedom which must be allowed to every one in the management of his own affairs. When competition is left free, individual error or folly will generally find a correction in the conduct of others.  But here is a combination of all the companies operating in the Blossburg and Barclay mining regions, and controlling their entire productions. They have combined together to govern the supply and the price of coal in all markets from the Hudson to the Mississippi rivers, and from Pennsylvania to the lakes.  This combination has a power in its confederate form which no individual action can confer.  The public interest must succumb to it, for it has left no competition free to correct its baleful influence.  When the supply of coal is suspended, the demand for it becomes importunate, and prices must rise.  Or if the supply goes forward, the price fixed

by the confederates must accompany it. The domestic hearth, the furnaces of the iron master, and the fires of the manufacturer, all feel the restraint, while many dependent hands are paralyzed, and hungry mouths are stinted. The influence of a lack of supply or a rise in the price of an article of such prime necessity, cannot be measured. It permeates the entire mass of community, and leaves few of its members untouched by its withering blight. Such a combination is more than a contract, it is an offence. 'I take it,' said Gibson, J., 'a combination is criminal whenever the act to be done has a necessary tendency to prejudice the public or to oppress individuals, by unjustly subjecting them to the power of the confederate, and giving effect to the purpose of the latter, whether of extortion or of mischief.'— *Commonwealth v. Carlisle,* Brightly's Rep. 40. In all such combinations where the purpose is injurious or unlawful, the gist of the offence is the conspiracy."

*People v. Sheldon et al.,* 139 N. Y. 251, was a criminal prosecution for conspiracy in restraint of trade in the case of dealers in coal wherein the conviction was sustained under a conspiracy statute not so broad in its terms as that in this state and the court held:

"That the offense of conspiracy was complete at common law on proof of unlawful agreement.—3 ch. Cur. Laws 142; *Ray v. O'Connell,* 11 Clk. & Fin. 155."

"\* \* \* A combination between independent dealers to prevent competition between themselves in the sale of an article of prime necessity is, in the contemplation of law, an act inimical to trade or

commerce, without regard to what may be done under and in pursuance of it, and although the object of such a combination was merely the due protection of the parties against ruinous rivalry, and no attempt was made to charge undue or excessive prices; where it appears that the parties acted under the agreement an indictment for conspiracy is sustainable."

The supreme court of Georgia in *Brown & Allen et al. v. Jacobs Pharmacy Co.*, 115 Ga. 429, a very well considered case, and containing an extensive review of the authorities upon the question at issue here, including very many cited by counsel for the appellants and appellees in this case, reaches the same conclusion as the court of Errors and Appeals of New Jersey in Firemans' Ins. Co. *supra*.

This case involved a combination of druggists and the court holds that at the common law:

"A combination of mercantile dealers to compel another dealing in similar goods to sell at prices fixed by it, or, upon his refusal so to do, to prevent those of whom its members are purchasing customers from selling goods to him, is, upon general legal principles, contrary to public policy and void; and the members of such a combination may, collectively or individually, be, by appropriate injunction, restrained from carrying into effect such purpose as that indicated above."

The evils of a monopoly in the articles of food are well and clearly stated in the case, *State ex rel. v. Armour Packing Co.*, 173 Mo., 356, as follows:

"Pools, trusts and conspiracies to fix and maintain the prices of the necessaries of life, strike at the foundations of government; instill a destructive

poison into the life of the body politic; wither the
energies of competitors; blight individual invest-
ments in legitimate business; drive small and hon-
est dealers out of business for themselves, and make
them mere 'hewers of wood and drawers of water'
for the trust; raise the cost of living and lower the
price of wages; take from the average American
freeman the ability to supply his family with neces-
sary and wholesome food; force the boys away from
school and into the various branches of trade and
labor, and the girls into workshops and other ave-
nues of business and make them bread-winners while
they are yet almost infants, because the head of
the house can not earn enough to feed and clothe
them. The wisdom and experience of all ages and
all peoples have demonstrated the necessity for laws
against such combinations and for the rigid enforce-
ment of them.''

From this examination and review of the au-
thorities cited and from the authorities in such cases
cited and relied on, it would seem that the conclu-
sion is clearly and overwhelmingly supported, that
at the common law, conspiracies and combinations
of the character of the case at bar are unlawful,
and unlawful in the sense that they may be re-
strained in a court of equity at the suit of the at-
torney general on behalf of the people, and that the
conspirators are subject to criminal indictment.
And this without the aid of a so-called anti-trust
statute, for these are but a reiteration of the com-
mon law upon that subject.

''It must be borne in mind that no new offense
is created, and, being declaratory of the common law,
no doubtful question arises, such as might be the

case of a statute which is a marked innovation, and this is a potent factor in determining whether the punishment imposed is of such character as to be subject to the inference of being enacted with a view to deter those affected from invoking the jurisdiction of the courts.  Rather it belongs to that class of cases where the penalties imposed for infractions of the long-recognized law may be imposed as deterrents, and for the public good, by reason of their severity.—*Allen v. Flood,* A. C. 1898, 1, 131; Bishop, Criminal Law, § 210''.  *Knight & Julison Co. v. Miller,* 87 N. E. 823.

We come now to the objection raised by appellants in their motion to dismiss the complaint upon the ground that the attorney general has no authority or power to institute or prosecute such an action in the name of or on behalf of the people of the state.

It will have been observed from a consideration of the cases above, that in many of them the attorney general has so appeared and prosecuted cases of this character, in the nature of information and application for injunction, and in states with constitutions and statutes in that respect similar to our own.

The constitution provides, sec. 1, art. 4:

''The executive department shall consist of a governor   *  *  *   attorney general, etc.,   *  *  * and they shall perform such duties as are prescribed by this constitution or by law.''

Sec. 6189 R. S., 1908, in pursuance of this constitutional provision provides:

''The attorney general shall attend in person at the seat of government during the session of the

general assembly and the supreme court, and shall appear for the state, prosecute and defend all actions and proceedings, civil and criminal, in which the state shall be a party or interested, *when required to do so by the governor or general assembly,* and shall prosecute and defend for the state all causes in the supreme court in which the state is a party or interested."

It is alleged in the information "comes now the plaintiff, the People of the State of Colorado, by William H. Dickson, attorney general of said state, who, having been first required by the governor of Colorado, to prosecute this action, etc." It seems quite clear that under this state of the law and fact that the attorney general was thus clothed with sufficient authority to institute the proceeding. But if not, then there can be no doubt that he is so authorized under the common law as judicially ͺdetermined in this country.

In 20 Bradwell, after reciting the common law powers of the attorney general together with a history of that office both in England and in the United States at page 288, it is said:

"There is nothing in our present constitution or statutes which necessitates, in our opinion, a construction which would exclude the attorney general from the exercise of common law powers in addition to those conferred by the statute. The constitution authorizes him to perform such duties as may be prescribed by law. It is said that the word 'prescribes' can properly be held to refer only to the statutory law,—the lex scripta. This, plainly, is too narrow an interpretation of the word. It will be remembered that Blackstone defines municipal

law to be 'a rule of civil action prescribed by the supreme power of the state, commanding what is right and prohibiting what is wrong, and that the learned author thereupon proceeds to divide the law as thus defined into the lex scripta and the lex non scripta.   *   *   *   We see, then no difficulty in interpreting the constitutional provision that the attorney general shall perform such duties as may be prescribed by law, as meaning that he shall perform such duties as shall be prescribed by any law, statutory or otherwise, by which the duties of the attorney general, as that officer is known to our jurisprudence, are imposed and defined.''

But our own supreme court has decided the precise question in the case of the *People v. Tool,* 35 Colo. 236, where it is said:

''It is the function of the attorney general, by information, to protect the rights of the public, and, in so doing he has the right to resort to the more lenient remedy of injunction to prevent wrongs against the public rather than wait until after their commission, and then seek to punish the wrong-doers.  The bill discloses that certain of the respondents have entered into a conspiracy to commit the illegal acts charged.  These acts will affect the entire state.  Individuals cannot invoke the power of a court of equity to enjoin these acts, but the state, in its sovereign capacity as *parens patriae* has the right to invoke the power of a court of equity to protect its citizens when they are incompetent to act for themselves.  The state is not bound to wait until the object of the illegal combination is effected which will deprive the people of their liberties and constitutional rights, but may bring an action at once

to prevent its consummation; and, while the writ of injunction may not be employed to suppress a crime, as such, yet when acts, though constituting a crime will interfere with the liberties, rights and privileges of citizens, the state not only has the right to enjoin the commission of such acts, but is its duty to do so.—In re Debs, 158 U. S. 564; *Attorney General v. R. R. Co., supra; State v. Houser,* 100 N. W. 964; *Attorney General v. Blossom,* 1 Wis. 317; *Columbian Athletic Club v. State,* 40 N. E. 914; *Louisville N. R. Co. v. Commonwealth,* 31 S. W. (Ky.) 476; *Commonwealth v. McGovern,* 66 L. R. A. (Ky.) 280; *People v. Truckee Lumber Co.,* 116 Cal. 397; *In re Court of Honor,* 85 N. W. (Wis.) 497.''—35 Colo. 225.

Lastly, in support of the demurrer it is contended that the district court had no jurisdiction of the cause, if it be held to be *publici juris,* and the Tool case and that of *People v. District Court,* 37 Colo. 443, are cited in support of the contention that in such case the jurisdiction is exclusively with the supreme court.

It is not contended here, nor alleged in the information, that the alleged conspiracy is by all the wholesale or retail dealers of the state, nor that it affects all the people of the state. Neither does it involve an election wherein all the people are effected. In this case also, the injury is personal to individuals which, in the aggregate, give it the public interest which forms the basis of the right of action in the form herein instituted, and that, upon the theory that it avoids a multiplicity of suits, together with the uncertainty in ascertaining the precise injury to each individual. This as we have seen,

constitutes a common law nuisance and conspiracy in restraint of trade which may, as the case may·be, effect any considerable number of the people, as a city or town, and is not *publici juris* in the sense that it must effect all the people, or the government of the commonwealth.

Certainly Mr. Justice Gabbert could not have had in mind this contention of appellants when he cited the cases as above in support of his conclusion, quoted. *Columbian Athletic Club v. State, supra,* was instituted in the circuit court and determined on appeal, and in *Louisville & N. R. Co. v. Commonwealth, supra,* which case likewise was from the circuit court; and in the *People v. Truckee Lumber Co., supra,* for that was on appeal; and in *Commonwealth ex rel. in Attorney General v. Pratt et al, supra,* which was an appeal case, all of which cases were upon the relation of the attorney general.

While as a rule the supreme court will exercise original jurisdiction only of matters *publici juris,* yet it does not follow that it has exclusive jurisdiction of all matters *quasi publici juris,* or rather of all matters effecting the public interest. This is clear from the decision in the Tool case, and also from the case of *Wheeler v. N. C. Irrigation Co.,* 9 Colo. 248.

There is no right involved in this case essential to the exercise of supreme political authority. In both the Tool and Johnson cases, it is apparent that a necessary element in the exercise of the sovereignty or supreme political authority was involved. The expression of the sovereign will of the people as expressed at the polls was alleged to have been interfered with.

There can be no claim in the case at bar that the sovereignty of the state is violated, or that the usurpation or the illegal use of its prerogatives or franchises is the principal question.

In *Duluth Elevator Co. v. White,* 90 N. W., relied upon by the court in the Johnson case, at page 14, it is said, quoting from *Attorney General v. City of Eau Claire,* 37 Wis. 400:

"It is not enough to put in motion the original jurisdiction of this court that the question is *publici juris;* it should be a question *quod ad statum republicae pertinet,*—one affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people."

And the court continues, that the interposition of the supreme court is only required when necessary *"to preserve the prerogatives and franchises of the state in its sovereign character;* this court judging of the contingency in each case for itself. For all else, though raising a question *publici juris,* ordinary remedies and ordinary jurisdictions are adequate."

We understand the view of our supreme court to be, therefore, that it will assert its exclusive jurisdiction when necessary to preserve and protect the sovereignty and to maintain, unimpaired, the governmental authority of the state; but, that over ordinary matters, although they may in a sense be *publici juris* and effect very closely the interest of the people of the entire state, or of a large part of the state, the district courts have original jurisdiction.

See, also, the language of the Supreme Court in *People ex rel. v. Rogers,* 12 Colo. 281, where it is · said:

"Besides, the case may be one *publici juris,* yet if the court is satisfied that the issues can be fully determined and the rights of all persons preserved and enforced in the courts below, it may, in the exercise of a sound legal discretion, decline to assume jurisdiction."

From this it would seem clear that the supreme · court of this state has at no time said, or intended to say, that it would assume exclusive original jurisdiction in cases of the character of the one at bar, in contravention of the rule and practice in every state in the Union, with similar constitutional provisions.

For these reasons, the judgment of the district court is affirmed.

All the judges concurring.